# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| Qwest Communications Corporation,<br><br>    Plaintiff,<br><br>v.<br><br>Superior Telephone Cooperative, The Farmers Telephone Company of Riceville, Iowa, Dixon Telephone Company, Interstate 35 Telephone Company d/b/a Interstate Communications Company, Reasnor Telephone Company, LLC, Great Lakes Communication Corp., Aventure Communication Technology, LLC, Future Fone Services Inc., Free Call Planet LLC, Audiocom, LLC, Fonpods, Inc., FreeConferenceCall Holdings Corporation and Slone Group, Inc.<br><br>    Defendants. | No. _____ |

## COMPLAINT AND JURY DEMAND

Qwest Communications Corporation ("QCC"), by and through its attorneys, for its complaint against Defendants Superior Telephone Cooperative ("Superior"), The Farmers Telephone Company of Riceville, Iowa ("Farmers-Riceville"), Dixon Telephone Company ("Dixon"), Interstate 35 Telephone Company d/b/a Interstate Communications Company ("Interstate 35"), Reasnor Telephone Company, LLC ("Reasnor"), Great Lakes Communication Corp. ("Great Lakes"), Aventure Communication Technology, LLC ("Aventure"), Future Fone Services Inc. ("FuturePhone"), Free Call Planet LLC ("FreeCallPlanet"), Audiocom LLC ("FreeChatLines"), Fonpods, Inc. ("Fonpods"), FreeConferenceCall Holdings Corporation

("FreeConferenceCall"), and Slone Group, Inc. ("HotLiveSexChat") (collectively "Defendants"),

alleges as follows:

## INTRODUCTION

1.      Through this lawsuit, QCC seeks to stop the Defendants from engaging in their

illegal, unfair and fraudulent practice of obtaining millions of dollars in terminating switched

access charges from QCC to which the Defendants are not entitled.  Specifically, the Defendants

have conspired to create, and indeed created, a scheme to set up "free" conference calls, "free"

chat rooms, "free" adult content calling, "free" podcasts, "free" voice mail and "free"

international calling services.  The Defendant providers of local exchange telephone service

(hereinafter the "LEC Defendants") charge QCC (in some instances at the exorbitant rate of over

13 cents per minute) for their routing of calls to companies that advertise free chat room services,

conference bridge services, adult content site services, podcasts, voicemail or international

calling (hereinafter the "Free Calling Service Companies").  Then, the LEC Defendants provide

kickbacks of a portion of the terminating switched access revenues paid by long distance

providers like QCC to the Free Calling Service Companies, including to the Free Calling Service

Company Defendants.[1]  This "traffic pumping" scheme – which has caused millions of dollars in

damages to QCC – constitutes a violation of several federal statutes, Iowa statutes and common

law principles.  QCC seeks to enjoin this conduct going forward and obtain declaratory relief,

money damages for the improper and illegal charges QCC has paid to date, punitive damages,

and a return of QCC's reasonable attorney's fees and costs incurred in prosecuting this action.

---

[1]  Throughout this Complaint, QCC will refer to both "Free Calling Service Company
Defendants" as well as "Free Calling Service Companies."  At this time, QCC has not attempted
to name all of the Free Calling Service Companies that may place their equipment and offer their
services behind the LEC Defendants. Thus, the "Free Calling Service Company Defendants" are
a subset of the "Free Calling Service Companies."

## JURISDICTION AND VENUE

2.       This Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, and 47 U.S.C. § 207 because several of QCC's claims arise under the Communications Act of 1934, a law of the United States.  Because QCC's state law claims form part of the same case or controversy as the Communications Act claims, the Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. §1367(a).  Finally, this Court has jurisdiction over QCC's requests for declaratory relief under 28 U.S.C. §§ 2201 and 2202.

3.       This Court has personal jurisdiction over the Defendants as they each conduct or have conducted continuous, systematic and routine business within the State of Iowa.  The Defendants also committed tortious acts within the State of Iowa, causing injury within the State.

4.       Venue is proper in this judicial district under 28 U.S.C. § 1391.  One or more of the Defendants reside in this judicial district, and all of the Defendants have conducted business in Iowa, are subject to personal jurisdiction in Iowa, and therefore "reside" in Iowa within the meaning of 28 U.S.C. § 1391(b) and (c).

5.       Venue is also proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims alleged herein occurred in this district.  Alternatively, one or more of the Defendants may be found in this judicial district and there is no other district in which the action otherwise may be brought.

## THE PARTIES

6.       Qwest Communications Corporation ("QCC") is a Delaware corporation with its principal place of business located at 1801 California Street, Denver, Colorado 80202.  QCC provides a wide array of telecommunications services nationwide.  At all times relevant, QCC is and has been qualified and registered to do business in the state of Iowa.

7.     Superior, a LEC Defendant, is an Iowa independent local exchange company (ILEC) that has its principal place of business in Superior, Iowa, and that provides local telephone exchange and other services in and near Superior, Iowa. On information and belief, Superior provides connections to at least the following Free Calling Service Companies: FuturePhone.com, AllFreeCalls.net, FreeChatLines.com, a purveyor of adult content, and HotLiveSexChat.com, another purveyor of adult content.

8.     Farmers-Riceville, a LEC Defendant, is an Iowa independent local exchange company (ILEC) that has its principal place of business in Nora Springs, Iowa, and that provides local telephone exchange services and other services in and near Nora Springs, Iowa.  On information and belief, Farmers Telephone of Riceville provides connections to at least the following Free Calling Service Companies: FreeConferenceCall.com and Ripple Communications – a purveyor of adult content.

9.     Dixon, a LEC Defendant, is an Iowa independent local exchange company (ILEC) that has its principal place of business in Spencer, Iowa, and that provides local telephone exchange services and other services in and near Dixon, Iowa. On information and belief, Dixon provides connections to at least the following Free Calling Service Company: FreeChatLines.com – a purveyor of adult content.

10.     Interstate 35, a LEC Defendant, is an Iowa independent local exchange company (ILEC) that has its principal place of business in Truro, Iowa, and that provides local exchange telephone services and other services in and near Truro, St. Charles and St. Mary's, Iowa. On information and belief, Interstate 35 provides connections to at least the following Free Calling Service Company: CallChinaForFree.com.

11.    Reasnor, a LEC Defendant, is a competitive local exchange carrier (CLEC) that has its principal place of business in Sulley, Iowa, and that provides local exchange telephone services and other services in and near Sulley, Iowa.

12.    Great Lakes, a LEC Defendant, is an Iowa competitive local exchange company (CLEC) that has its principal place of business in Spencer, Iowa.  On information and belief, Great Lakes provides connections to at least the following Free Calling Service Companies: FreeCalls2TheWorld.com and Fonpods.com.

13.    Aventure, a LEC Defendant, is an Iowa limited liability competitive local exchange carrier (CLEC) that has its principal place of business in Sioux City, Iowa.  On information and belief, Aventure provides connections to the following Free Calling Service Companies, Futurephone.com, Ophone.com, FreeChatLine.com – a purveyor of adult content, and FreeConference.com.

14.    Upon information and belief, FutureFone, a Free Calling Service Company Defendant, operates "futurephone.com", is a Nevada limited liability company that has its principal place of business in Reno, Nevada, and provides services through connections with at least the following LEC Defendants:  Superior and Aventure.

15.    Upon information and belief, FreeCallPlanet, a Free Calling Service Company Defendant, operates "freecallplanet.com' and "callchinaforfree.com", is a Nevada limited liability company that has its principal place of business in Carson City, Nevada, and provides services through connections with at least the following LEC Defendant:  Interstate 35.

16.    Upon information and belief, FreeChatLines, a Free Calling Service Company Defendant, operates "freechatlines.com", is a Nevada limited liability corporation company that

has its principal place of business in Las Vegas, Nevada, and provides adult content services through connections with at least the following LEC Defendants: Superior and Dixon.

17.     Upon information and belief, Fonpods, a Free Calling Service Company Defendant, operates "fonpods.com", is a Delaware corporation that has its principal place of business in Los Angeles, California, and provides services through connections with at least the following LEC Defendant: Great Lakes.

18.     Upon information and belief, FreeConferenceCall, a Free Calling Service Company Defendant, operates "freeconferencecall.com", is a California corporation that has its principal place of business in Long Beach, California, and provides services through connections with at least the following LEC Defendant: Farmers-Riceville.

19.     Upon information and belief, HotLiveSexChat, a Free Calling Service Company Defendant, operates "hotlivesexchat.com", is a corporation with its principal place of business in Burnsville, Minnesota and provides adult content services through connections with at least the following LEC Defendant: Superior.

## THE DEFENDANTS' UNFAIR, UNJUST AND FRAUDULENT SCHEME

### A.     Background Information on the Manner in which Long Distance Calls are Completed in the United States.

20.     Traditionally, telephone calls have been divided into local calls and long distance calls. Local calls originate and terminate within one designated local calling area. Typically one or more local exchange carrier (LEC)[2] serves customers within a local calling area. Incumbent LECs own wires and switches that originate calls to and complete telephone calls to their

_____

[2] There are "incumbent" local exchange carriers (ILECs), which are the traditional providers of local exchange services in an area, as well as "competitive" local exchange carriers (CLECs), which are new entrants that are supposed to offer local services in competition with incumbent LECs. Defendants Superior, Interstate 35, Dixon, and Farmers-Riceville are ILECs. Defendants Great Lakes, Reasnor and Aventure are CLECs.

customers located within their local service territory.  Domestic long distance calls are carried by a long distance carrier, or "interexchange carrier" ("IXC"), from one local calling area to another local calling area either within the same state or between different states.

21.     For example, when a Minneapolis, Minnesota resident calls someone in Superior, Iowa, which is in a different local calling area, the Minneapolis resident must use a long distance service, such as one provided by QCC.  Long distance carriers typically carry long distance calls from the originating exchange to the terminating exchange.  But, it has become increasingly more frequent for the selected long distance carrier to hand the call off to another long distance carrier because it is less expensive to have another carrier complete the call than it is for the selected long distance carrier to complete the call itself.

22.     When a customer makes a long distance call, the call is originated on wires and facilities owned by the LEC serving the end-user customer making the call.  Similarly, the call is terminated over wires and facilities owned by the LEC serving the end-user customer receiving the call.   In the United States, long distance companies pay "originating" switched access charges to the LECs that serve customers who initiate long distance calls within their local calling area and pay "terminating" switched access charges to the LECs that serve customers who receive long distance calls within their local calling area.  "Access charges are the means whereby local telephone companies recover from interstate customers their share of the cost of the local plant that is used in the origination and termination of interstate calls." *Ohio Bell Tel. Co. v. FCC*, 949 F.2d 864, 868 (6th Cir. 1991) (quoting *National Assoc. of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1103-05 (D.C. Cir 1984)).  Often these terminating switched access rates are less than 1 cent per minute.  For example, the switched access rate for Qwest Corporation, the local exchange company affiliated with QCC, is $0.0055 per minute.  As a

general matter, providers of terminating switched access services, like the LEC Defendants, are

the exclusive providers of such service to the customers they serve in the local calling area. That

is, for example, if a QCC customer wishes to make a long distance call to a Superior customer,

QCC has no choice but to use Superior's facilities to deliver that call to the Superior customer.

23.     Over 1000 ILECs throughout the United States charge long distance companies

rates for terminating switched access charges as set forth in the National Exchange Carrier

Association (NECA)'s tariff on file with the Federal Communications Commission (FCC). The

NECA FCC tariff sets a rate of approximately $0.05 per minute[3] for terminating access charges.

The revenues resulting from the NECA switched access charges are pooled, and each

participating ILEC obtains a pro rata portion of the pooled assets. As the NECA website states,

the NECA tariff pooling arrangements help "to minimize an ILEC's regulatory expenses

associated with developing and filing its own tariff. It also helps minimize an ILEC's cost

recovery risks through nationwide pooling of costs and revenues. An ILEC has the option of

participating in Tariff No. 5 in its entirety, in one or more of the tariff pools, or filing its own

tariff with the FCC."

**B.     The LEC Defendants Defraud Long Distance Companies Like QCC By Generating Unreasonably High Terminating Switched Access Charges and then Providing a Kickback of a Portion of These Charges to the Free Calling Service Companies.**

24.     The LEC Defendants have undertaken business relationships with certain of their

customers to whom they provide connections – the Free Calling Service Companies – to exploit

the LEC Defendants' exclusive ownership of facilities that provide terminating switched access

---

[3] The terminating switched access rate is affected by the distance over which the call is transported. On information and belief, as part of the misconduct alleged in this Complaint, Superior intentionally routed calls over a longer than necessary distance to increase the switched access charges it could bill to long distance carriers such as QCC.

services to telephone numbers within their local area. The goal of these relationships was and is to dramatically increase the amount of long distance traffic delivered to the LEC Defendants' customers, namely to the Free Calling Service Companies, and force long distance carriers such as QCC to pay exorbitantly high terminating switched access charges.

25.     As part of the Defendants' scheme, many of the LEC Defendants including Superior, Farmers-Riceville, Interstate 35 and Dixon, opted out of the NECA pool and thereby obtained the ability to collect all of the switched access revenues for calls they terminate within their local calling area and avoided the sharing of revenues across the NECA membership.[4] Despite this, Superior, Farmers-Riceville, Interstate 35 and Dixon retained virtually all other aspects of the NECA tariff.   Superior then went one step further and raised its rates for terminating switched access to over 13 cents per minute. For calls that originate and terminate within the state of Iowa, the LEC Defendants use the Iowa Telecommunications Association ("ITA") tariff to charge switched access and receive the revenue on an individual LEC basis.

26.     Great Lakes, Reasnor and Aventure – the three named defendants who are competitive local exchange carriers ("CLECs") – submitted interstate tariffs with the FCC, which model the NECA tariffs in many respects.   On information and belief, Great Lakes, Reasnor and Aventure were formed for the specific purpose of collecting terminating access charges from long distance companies such as QCC generated through calls destined for the Free Calling Service Companies.

27.     The LEC Defendants conspired with the Free Calling Service Company Defendants to act as their purported local telephone exchange provider.   The Free Calling Service Company Defendants connected their equipment (on information and belief, such as an

---

[4] CLECs are not eligible to opt into the NECA tariff. Only ILECs with less than 50,000 lines can participate.

intelligent voice response system) to the LEC Defendants' network facilities. On information and belief, in many if not all instances, the Free Calling Service Company Defendants' voice recognition equipment is actually located outside of the LEC Defendants' service territories. In other circumstances, the Free Calling Service Company Defendants provide a service that does not terminate a call at their equipment, but simply facilitates communication between multiple parties.

28.   The Free Calling Service Company Defendants then advertise via websites, written publications, and otherwise to encourage people all over the United States to call the Free Calling Service Company Defendants via telephone numbers assigned to the LEC Defendants switches.[5]   Once a customer calls the Iowa telephone number, a connection is made to the Free Calling Service Companies' voice recognition system, which allows these parties to conduct conference calls, chat rooms, voice mail systems, adult content calls and the like. In no circumstance, or virtually no circumstance, are the Free Calling Service Company Defendants providing a service in which the end user to which the call is directed is actually someone residing in one of these small Iowa communities. Instead, the Free Calling Service Company Defendants' computer systems connect people from all over the United States and the world so they can talk together. The sole purpose of the arrangements is to artificially and dramatically increase long distance traffic and, thereby, generate excessive and unreasonable terminating switched access revenue.

29.   The Free Calling Service Company Defendants offer to provide participants with "free" access to chat rooms, "free" conference bridge lines, "free" pornographic or other adult content calls, "free" voice mail, "free" podcasts and "free" international calling. Advertisements

---

[5] These telephone numbers have area-codes and prefixes (**NPA-NXX**-XXXX) that are assigned to the Defendant LECs.

directed to customers and potential customers of these Free Calling Service Companies are encouraged to make as many calls to their Iowa numbers as possible and to stay on the call for as long as possible.

30.     The services supplied by the Free Calling Service Companies cost a substantial amount of money to provide.  That is, services such as international calling, chat lines, podcasts, voice mail, and conference calls entail substantial investment.  Instead of the Free Calling Service Companies using revenue collected from customers to pay for the services they use, the LEC Defendants share a portion of their terminating switched access revenues with the Free Calling Service Companies.  The Free Calling Service Companies obtain these subsidies, and offer services to their customers for free.  Without the revenue from long distance carriers like QCC, the Free Calling Service Company Defendants would be required to collect the revenue necessary to support the services they provide from customers of the calling services.

31.     Despite the costs associated with the services, the Free Calling Service Companies offer them to the public free of charge.  They then encourage their customers to make a long distance call to the LEC Defendants in Iowa; the LEC Defendants charge QCC terminating switched access charges, sometimes as much as 13 cents per minute; and the LEC Defendants then kick back a portion of these terminating switched access charges to the Free Calling Service Companies.  In other words, this scheme allows the Defendants to make millions of dollars from proclaimed "free" services at the expense of long distance companies like QCC that pay excessive charges to route these long distance calls.

32.     The increase in switched access traffic and QCC's switched access costs has been dramatic.  By way of illustration, in June 2006, before Superior began its unlawful, unfair and illegal scheme, QCC delivered approximately 15,000 minutes of long distance calls per month to

Superior's approximately 175 customers. By November 2006, the volume of traffic delivered to Superior spiked to over 6.4 million minutes per month – an increase of over 42,000%. This constitutes an average of over 36,000 minutes of long distance services per customer in Superior, Iowa per month and led to monthly invoices of up to approximately $500,000. Collectively, the Defendants' fraudulent, unfair and unreasonable schemes have increased QCC's expenses millions of dollars per month.

**C.   The Defendants' Conceal Facts About Their Scheme From QCC To Prevent QCC From Blocking Calls Destined for Free Calling Service Companies.**

33.   The Defendants actively try to hide facts associated with their scheme from long distance carriers like QCC. The FCC has specifically given long distance carriers like QCC the ability to block (refuse to deliver) long distance calls destined for companies like the Free Calling Service Company Defendants. However, long distance carriers like QCC cannot block long distance calls directed to an entire community such as to Superior, Iowa without permission from the FCC. 47 U.S.C. § 214(a). Thus, QCC must know the exact telephone numbers utilized by the Free Calling Service Companies in order to block the calls. The LEC Defendants serve very small communities, often with 1,800 access lines or fewer. The LEC Defendants, however, have thousands of telephone numbers assigned to them. Specifically: (a) Superior has approximately 175 access lines, but 10,000 telephone numbers available to it; (b) Farmers-Riceville has approximately 1,746 access lines, but 280,000 telephone numbers available to it; (c) Dixon has approximately 595 access lines, but 10,000 telephone numbers available to it; (d) Interstate 35 has approximately 1,353 access lines, but 30,000 telephone numbers available to it; (e) Reasnor has 10,000 telephone numbers available to it; (f) Great Lakes has 12,000 telephone numbers available to it; and, (g) Aventure has at least 9,000 telephone numbers available to it.

This means the LEC Defendants have thousands of telephone numbers at their disposal that they can assign to the Free Calling Service Companies.

34.     The Free Calling Service Company Defendants routinely change the telephone numbers that their participants may call in order to obtain "free" services.  Often, Free Calling Service Companies change their telephone numbers each day.  On information and belief, the LEC Defendants assign Free Calling Service Companies numerous telephone numbers in order to facilitate the changing of telephone numbers so as to prevent QCC and other long distance carriers from tracking and blocking calls destined for Free Calling Service Companies.

**D.     Many of the Free Calling Service Companies' Advertisements Provide False and Misleading Information About the Source of The Funding for Their Services.**

35.     Many of Free Calling Service Companies' advertisements and promotional materials contain false and misleading information about how they are able to provide "free" services.  For example, some websites state that "tax dollars" are paying for the free calls.  Others state that the "Universal Service Fund" is paying for the long distance calls.  Others state that the Free Calling Service is compensated through advertising banners on its site.  In reality, on information and belief, the Free Calling Service Companies are compensated through kickbacks from the LEC Defendants.  On information and belief, the Free Calling Service Companies use other false and misleading tactics in advertising, on websites, and in other promotional materials to convince customers to utilize their services.

**E.     The LEC Defendants' Practice to Kickback a Portion of Their Terminating Switched Access Revenue to the Free Calling Service Companies Negates QCC's Obligation to Pay Access Charges for Any of the Traffic Directed to the Free Calling Service Companies.**

36.     Local exchange carriers (LECs) bill long distance carriers switched access charges to compensate the LECs for the long distance carriers' use of their telecommunications

network.  The FCC has stated that terminating switched access charges "should be rate neutral. By this we mean that our primary concern in regulating small telephone companies is to ensure that their access rates are not unreasonably high."  *In re Regulation of Small Telephone Companies,* 2 FCC Rcd. 1010, 1986 FCC LEXIS 2208, ¶ 23, FCC 86-537 (Rel. Dec. 12, 1986). None of the stated purposes for which switched access services are invoiced or billed include the sharing of revenue by the LEC Defendants with customers for the purpose of driving increased long distance traffic.

37.    The collection of terminating switched access tariff revenue for the purpose of sharing that revenue with the Free Calling Service Companies and through the traffic pumping schemes described in this Complaint is inconsistent with the overall purpose of switched access charges, because that revenue is not used, nor is it intended to be used, for the purposes described in the Defendant LECs' FCC or state tariffs, nor for the purposes set forth by the FCC or Iowa Utilities Board.  Moreover, given the financial arrangements between the LEC Defendants and the Free Calling Service Company Defendants, the LEC Defendants are essentially delivering traffic to themselves, which is not subject to terminating switched access charges.

F.    **The LEC Defendants Do Not Terminate Most, if Not All, of the Calls at Issue; Therefore, They Are Collecting Terminating Switched Access Revenue in Violation of the Law and Their Own Tariffs.**

38.    All of the LEC Defendants' tariffs state that they can only obtain terminating switched access revenue when they terminate a telephone call.  Some, if not all, of the services being provided by the Free Calling Service Companies do not "terminate" in the local exchange area in which the LEC Defendants assess access charges.  For example, international calls "terminate" in the foreign country that QCC's end users intended to reach, and not at the Iowa local telephone number associated with an international calling Free Calling Services Company

Defendants.  On information and belief, many, if not all of the calls at issue, are delivered to equipment of Free Calling Service Companies located outside of the LEC Defendants' local calling areas, which means they do not terminate the traffic.  Thus, the LEC Defendants are charging QCC for "terminating" switched access in violation of the law and their own state and federal tariffs, because they do not terminate many or all of the calls in issue.

39.     On information and belief, conference call facilities, voice mail, and chat rooms and the like do not terminate in the local exchange area for which access revenues are assessed by the LEC Defendants.  Rather, the Defendants simply bridge multiple users from different locations together in a manner that does not terminate the call.  Therefore, the LEC Defendants are charging QCC for "terminating" switched access in violation of their own tariffs, because they do not terminate such calls.

### G.     The LEC Defendants Discriminate in the Provision of Services Between Customers.

40.     The LEC Defendants also illegally discriminate between their end user customers.  As part of their traffic pumping arrangements, the LEC Defendants share some of their revenue with the Free Calling Services Company Defendants.  Several of the LEC Defendants' customers other than Free Calling Services Company Defendants purchase services that are functionally similar or identical to the services provided to the Free Calling Services Company Defendants.  However, the LEC Defendants do not share revenues with their other customers in the same manner or to the same degree they share revenues with the Free Calling Services Company Defendants.  Accordingly, the LEC Defendants are discriminating against their other customers when they share revenues on a preferential basis with the Free Calling Services Company Defendants.

41.    This discrimination is unreasonable and unjust because the revenue sharing with the Free Calling Services Company Defendants is tied to an effort to exploit the LEC Defendants exclusive ability to provide switched access services and collect exorbitant switched access charges from long distance carriers such as QCC.

**COUNT I**
**(47 U.S.C. §§ 206, 207 Claim for Violation of 47 U.S.C. § 201(b))**
**(Against all LEC Defendants)**

42.    QCC repeats and realleges each and every allegation of paragraphs 1 through 41 above, and incorporates them by reference as though fully set forth herein.

43.    The LEC Defendants have engaged in an unjust and unreasonable practice in connection with their provision of interstate communication services, in violation of their 47 U.S.C. § 201(b) duties.  In addition, the LEC Defendants have knowingly set access rates based on factual assumptions concerning the level of traffic they expected to process, resulting in access rates wildly out of line with the amount of traffic that the LEC Defendants are billing for.

44.    The LEC Defendants have engaged in a scheme to knowingly charge long distance carriers, including QCC, under their access tariffs for purportedly "terminating" long distance calls destined for "free" chat-line and other such purported services offered by the Free Calling Service Companies and with whom the LEC Defendants share the resulting switched access revenues.

45.    This scheme has allowed the LEC Defendants to substantially inflate the number of long distance calls routed through the LEC Defendants, including but not limited to QCC's customers, and thereby substantially inflate the LEC Defendants' terminating access revenue.

46.    Prior to establishing the revenue-sharing arrangements with the Free Calling Service Companies, each of the LEC Defendants that are incumbent providers dropped out of the

NECA tariff pool, which provided them with the ability to receive all of the terminating switched access services terminating in their local area. In furtherance of its scheme, after dropping out of the NECA pool, Superior filed a tariff that set higher rates for terminating switched access. The LEC Defendants that are competitive local exchange carriers also have tariffs that permitted them to collect switched access charges on an individual basis and, on information and belief, these telephone companies were created in large part to serve as a conduit to generate excessive long distance traffic and, therefore, terminating switched access revenue from long distance carriers like QCC.

47.     By deliberately establishing individual tariffs that generate revenues far exceeding what is necessary to compensate the LEC Defendants for the use of their local network, and knowing that their schemes with the Free Calling Services Company Defendants would stimulate massive increases in long distance telephone calls, the LEC Defendants have abused their regulatory status as common carriers to intentionally extract massively-increased fees from QCC.

48.     The LEC Defendants intended this scheme to require QCC (and other long distance carriers) to bear all of the costs of the Free Calling Services Companies without their consent and without benefit to QCC (or the other long distance carriers), and thus allow the LEC Defendants to reap enormous profits at QCC's (and other long distance carrier's) expense.

49.     The LEC Defendants' violations of Section 201(b) have caused QCC to suffer actual economic damages in an amount that QCC will prove at trial. QCC therefore has the right to sue for its actual damages resulting from the LEC Defendants' violations of Section 201(b), pursuant to Sections 206 and 207 of Title 47. Pursuant to Section 206, QCC also seeks its reasonable attorney fees incurred in this litigation.

**COUNT II**
**(47 U.S.C. §§ 206, 207 Claim for Violation of 47 U.S.C. § 201(b))**
**(Against all LEC Defendants)**

50.    QCC repeats and realleges each and every allegation of paragraphs 1 through 49 above, and incorporates them by reference as though fully set forth herein.

51.    The LEC Defendants have engaged in an unjust and unreasonable practice in connection with their provision of interstate communication services, in violation of their 47 U.S.C. § 201(b) duties.

52.    The LEC Defendants have engaged in a scheme to knowingly charge long distance carriers, including QCC, under their access tariffs for purportedly "terminating" long distance calls destined for "free" chat-line and other such purported services offered by the Free Calling Service Companies within the LEC Defendants' respective local exchange areas.  On information and belief, in many if not all instances, the LEC Defendants do not terminate the calls destined for the Free Calling Service Companies.

53.    This scheme has allowed the LEC Defendants to substantially inflate the number of minutes for which the LEC Defendants charge QCC terminating switched access revenues. Thus, the LEC Defendants have substantially inflated the bills for terminating switched access far in excess of that to which they are legally entitled.

54.    By deliberately charging QCC for terminating switched access on telephone calls that the LEC defendants do not terminate, the LEC Defendants have abused their regulatory status as common carriers to intentionally extract massively-increased fees from QCC.

55.    The LEC Defendants intended this scheme to require QCC (and other long distance carriers) to bear all of the costs of the Free Calling Services Companies without their

consent and without any benefit to QCC (or the other long distance carriers), and thus allow the LEC Defendants to reap enormous profits at QCC's (and other long distance carrier's) expense.

56.     The LEC Defendants' violations of Section 201(b) have caused QCC to suffer actual economic damages in an amount that QCC will prove at trial.  QCC therefore has the right to sue for its actual damages resulting from the LEC Defendants' violations of Section 201(b), pursuant to Sections 206 and 207 of Title 47.  Pursuant to Section 206, QCC also seeks its reasonable attorney fees incurred in this litigation.

### COUNT III
### (47 U.S.C. §§ 206, 207 Claim for Violation of 47 U.S.C. § 203)
### (Against all LEC Defendants)

57.     QCC repeats and realleges each and every allegation of paragraphs 1 through 56 above, and incorporates them by reference as though fully set forth herein.

58.     The LEC Defendants have tariffs filed with the FCC that contain published rates, terms and conditions.  The LEC Defendants are attempting to obtain payments from QCC under these tariffs for terminating switched access on calls that do not qualify for terminating switched access under the tariffs.  Thus, the LEC Defendants have and are continuing to charge rates other than published rates in the tariffs in violation of 47 U.S.C. § 203.

59.     The LEC Defendants have engaged in a scheme to knowingly charge long distance carriers, including QCC, under their access tariffs for purportedly "terminating" long distance calls destined for "free" chat-line and other such purported services offered by the Free Calling Service Companies.  On information and belief, in many if not all instances, the LEC Defendants do not terminate the calls destined for the Free Calling Service Companies.

60.     This scheme has allowed the LEC Defendants to substantially inflate the number of minutes for which the LEC Defendants charge QCC terminating switched access revenues.

Thus, the LEC Defendants have substantially inflated the bills for terminating switched access far in excess of that to which they are legally entitled.

61.     By deliberately charging QCC for terminating switched access on telephone calls that the LEC defendants do not terminate, the LEC Defendants have abused their regulatory status as common carriers to intentionally extract massively-increased fees from QCC.

62.     The LEC Defendants intended this scheme to require QCC (and other long distance carriers) to bear all of the costs of the Free Calling Services Companies without their consent and without any benefit to QCC (or the other long distance carriers), and thus allow the LEC Defendants to reap enormous profits at QCC's (and other long distance carrier's) expense.

63.     The LEC Defendants' violations of Section 203 have caused QCC to suffer actual economic damages in an amount that QCC will prove at trial.  QCC therefore has the right to sue for its actual damages resulting from the LEC Defendants' violations of Section 203, pursuant to Sections 206 and 207 of Title 47.  Pursuant to Section 206, QCC also seeks its reasonable attorney fees incurred in this litigation.

**COUNT IV**
**(Common Law Fraudulent Concealment)**
**(Against All Defendants)**

64.     QCC repeats and realleges each and every allegation of paragraphs 1 through 63 above, and incorporates them by reference as though fully set forth herein.

65.     QCC has a legal right to block calls destined for Free Calling Services Companies because the purpose of the Defendants' scheme to defraud is to generate excessive long distance calling and, therefore, unjust and unreasonable terminating switched access charges.

66.     The FCC has made plain that QCC has a right to block calls destined for Free Calling Services Companies.  *See, In re Total Telecommunications Services, Inc. and Atlas*

*Telephone Company, Inc. v. AT&T Corporation*, 16 FCC Rcd 5726, FCC LEXIS 1422, ¶¶28-31 (Mar. 13, 2001). These practices concerning the blocking of calls destined for companies such as the Free Calling Services Company Defendants are well known in the industry.

67.     Moreover, a very large percentage of the calls delivered by QCC to the Free Calling Services Company Defendants were originally delivered to a different long distance provider, such as Level 3 or Global Crossing. These companies then handed the calls to QCC for delivery to the Free Calling Services Company Defendants. Contracts with these other long distance providers contain express provisions that give QCC the right to block calls. Provisions such as these are commonplace and well known in the industry.

68.     The LEC Defendants had thousands of telephone numbers at their disposal for use in their scheme to defraud long distance companies like QCC. On information and belief, many of these excess telephone numbers were utilized for the express purpose of providing Free Calling Services Companies with multiple numbers that they can change repeatedly to impair and prevent long distance companies like QCC from monitoring the telephone numbers generating excessive volumes and blocking the calls.

69.     Defendants made a material omission by, among other things, failing to disclose all of the telephone numbers assigned to the Free Calling Service Companies so that Qwest could block the calls destined for the Free Calling Services Companies.

70.     The Defendants' omission was made knowingly, with the intent to deceive, trick and defraud long distance companies like QCC. QCC relied upon such material omission in that it was unable to act to block the calls destined for the Free Calling Services Company Defendants.

71.   The Defendants had a duty to disclose the withheld information to QCC, yet failed to disclose the information.  Moreover, the LEC Defendants are the exclusive providers of the terminating access services in question and were the only parties with the knowledge of the facts and circumstances associated with their scheme with the Free Calling Services Companies. The LEC Defendants withheld that information for the specific purpose of preventing QCC and other long distance carriers from blocking the subject calls.

72.   The Defendants' conduct caused QCC serious injury and damage, which damages will be proven at trial.  Defendants' conduct is also intentional, fraudulent, and/or malicious; Qwest therefore seeks and is entitled to punitive or exemplary damages.

**COUNT V**
**(Common Law Unfair Competition)**
**(Against All Defendants)**

73.   QCC repeats and realleges each and every allegation of paragraphs 1 through 72 above, and incorporates them by reference as though fully set forth herein.

74.   Defendants have caused QCC harm by conducting their businesses through a scheme, method, and/or practice of unfair competition, in violation of (1) principles of common business integrity and customary standards of business ethics; (2) federal statutes, and (3) state regulatory law.  The LEC Defendants have also misused their inherent and exclusive power over terminating switched access services.

75.   Defendants' conduct is likely to confuse or deceive consumers as to the nature of Defendants' services, such as, to wrongly believe that the Defendants are providing a "free" service, when in reality the service is subsidized completely by long distance carriers like QCC. Moreover, the Defendants have concealed information that would have allowed QCC to block the calls in question, as is its legal right.

76.     The LEC Defendants conduct of providing a kickback to one select group of customers when they have market power over the provision of terminating switched access services also constitutes unfair competition.

77.     Defendants' unfair competition has caused Qwest to suffer harm to its business, and is therefore entitled to damages to be determined at trial.  In addition, Qwest seeks and is entitled to any nonduplicative gain that the Defendants have obtained from their wrongful conduct.  Defendants' conduct is intentional, fraudulent, and/or malicious; Qwest therefore seeks and is entitled to punitive or exemplary damages.

## COUNT VI
### (Civil Conspiracy)
### (Against All Defendants)

78.     QCC repeats and re-alleges each and every allegation contained in paragraphs 1 through 77 of the Complaint as if set forth fully herein.

79.     Upon information and belief, each of the LEC Defendants and one or more of the Free Calling Services Company Defendants agreed to an illicit arrangement or arrangements as follows: (i) the Free Calling Services Company Defendants would place a "gateway" behind the LEC Defendant's; (ii) the LEC Defendants would assign multiple telephone numbers to the Free Calling Service Defendants; (iii) the LEC Defendants would bill QCC for terminating access charges on long distance calls that were routed through the Free Calling Service Defendants; (iv) the Free Calling Services Company Defendants would market services designed to increase volumes of traffic routed through the LEC Defendants; and (v) the LEC Defendants would share with the Free Calling Services Company Defendants a portion of the monies billed to or received from QCC.

80.     As explained above, many if not all of these calls do not terminate in the LEC Defendants' local calling areas.  The LEC Defendants' conduct in billing QCC for terminating access services for these calls violates the terms of the LEC Defendants' federal and Iowa access tariffs as well as federal and state law.  In addition, the Defendants are participating in a scheme to defraud through concealment and misrepresentations.

81.     The agreements reached between each LEC Defendant and one or more of the Free Calling Services Company Defendants constitute agreements to take unlawful actions.  The agreements between each LEC Defendant and one or more of the Free Calling Services Company Defendants constitute a civil conspiracy or conspiracies, and the LEC Defendants and the Free Calling Services Company Defendants are liable for the harm caused by the unlawful acts taken in furtherance of the conspiracy.

82.     The unlawful actions taken during and in furtherance of the unlawful agreements between each LEC Defendant and one or more of the Free Calling Services Company Defendants have injured QCC.  QCC prays for damages against the Defendants in an amount to be determined at trial.

**COUNT VII**
**(Breach of Contract)**
**(Against LEC Defendants)**

83.     QCC repeats and re-alleges each and every allegation contained in paragraphs 1 through 82 of the Complaint as if set forth fully herein.

84.     The LEC Defendants' FCC and state tariffs constitute contracts between the LEC Defendants and any purchaser of terminating switched access services, which includes QCC.

85.     The LEC Defendants are charging terminating switched access on calls they do not terminate in violation of the plain language of their tariffs.

86.     The LEC Defendants are in breach of their tariff provisions when they bill QCC for terminating switched access on calls they do not terminate.

87.     As a direct and proximate result of Defendants' conduct as alleged above, QCC has been damaged in an amount to be proven at trial.

**COUNT VIII**
**(Tortious Interference with Contract)**
**(Against All Defendants)**

88.     QCC repeats and re-alleges each and every allegation contained in paragraphs 1 through 87 of the Complaint as if set forth fully herein.

89.     QCC has contracts with numerous other long distance carriers including, but not limited to, Global Crossing and Level 3. These contracts specifically allow QCC to block calls that these carriers handed to QCC for delivery to the LEC Defendants.

90.     The Defendants entered into a scheme to prevent QCC from learning the information necessary to make a reasoned decision about the appropriate calls to block. Defendants' tortious conduct intentionally and improperly interfered with QCC's ability to take advantage of the full rights extended to QCC under the contracts.

91.     On information and belief, the Defendants knew that long distance carriers routinely hand calls to another long distance carrier, like QCC, to deliver the call on its behalf. These contracts are commonplace in the industry and therefore Defendants knew or should have known of the existence of provisions in these contracts that give QCC the right to block calls. Defendants knew of the legal rights QCC had to block certain types of calls.

92.     As a direct and proximate result of Defendants' tortious interference, QCC has been damaged in an amount to be proven at trial.

## COUNT IX
### (Unjust Enrichment)
### (Against All Defendants)

93.     QCC repeats and realleges each and every allegation of paragraphs 1 through 92 above, and incorporates them by reference as though fully set forth herein.

94.     Defendants, through their wrongful, improper, unjust, fraudulent and unfair conduct have reaped substantial and unconscionable profits from QCC under the LEC Defendants' tariffs.  As such, Defendants have received monies to which they are not entitled. .

95.     In equity and good conscience, it would be unjust for Defendants to enrich themselves at the expense of Qwest.

96.     Defendants' unlawful conduct will continue unless the relief prayed for is granted.

## COUNT X
### (Declaratory Judgment)
### (Against LEC Defendants)

97.     QCC repeats and realleges each and every allegation of paragraphs1 through 96 above, and incorporates them by reference as though fully set forth herein.

98.     The bills rendered by LEC Defendants to QCC contain charges that purport to assess QCC with terminating access charges for calls that the LEC Defendants did not terminate.

99.     The interstate and intrastate access charges that appear in the bills rendered by the LEC Defendants to QCC contain charges for other calls for which imposition of access charges is unlawful.

100.    The inclusion of these access charges in bills submitted to QCC violate the LEC Defendants' federal and state access tariffs, the Communications Act, the FCC's implementing rules, and state law.

101.   QCC is entitled to judgment under 28 U.S.C. § 2201(a) declaring that (i) the LEC Defendants are not providing terminating access services to QCC in connection with the calls routed to the Free Calling Services Company Defendants, (ii) the interstate and intrastate access charges that appear in the  bills rendered by the LEC Defendants to QCC violate the LEC Defendants' interstate and intrastate tariffs, the Communications Act and the FCC's implementing rules, and Iowa law, and (iii) QCC is not obliged to pay the interstate or intrastate access charges that appear in the bills rendered by the LEC Defendants to QCC that contain charges for calls made using the service of the Free Calling Services Company Defendants.


WHEREFORE, for the reasons stated above, QCC respectfully requests that judgment be entered for QCC on each and all of its claims, together with appropriate damages, declaratory relief, injunctive relief, reasonable costs and fees, including attorneys' fees and expert fees, and interest together with such other and further relief as the Court may deem just and equitable under the circumstances.

## QCC HEREBY DEMANDS A JURY TRIAL OF ALL ISSUES SO TRIABLE

February 20, 2007.


Respectfully submitted,

Charles W. Steese (pro hac vice application pending)
Phillip L. Douglass (pro hac vice application pending)
STEESE & EVANS, P.C.
6400 S. Fiddlers Green Circle, Suite 1820
Denver,  Colorado 80111
Telephone: (720) 200-0676
Facsimile:  (720) 200-0679
Email:  csteese@s-elaw.com
          pdouglass@s-elaw.com

by_____

David S. Sather
925 High Street 9S9
Des Moines, Iowa 50309
Telephone: (515) 243-5030
Facsimile: (515) 286-6811
Email: davidsather@msn.com